IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

RICHARD S. FAIREST-KNIGHT,

    Plaintiff,

    v.

MARINE WORLD DISTRIBUTORS, INC.,

    Defendant.

**CIVIL NO. 07-1708 (CVR)**

**OPINION AND ORDER**

**INTRODUCTION**

On August 8, 2007, plaintiffs Richard Fairest Knight (hereafter "Mr. Fairest"), Valerie A. Fairest Brooke (hereafter "Mrs. Fairest"), on their on behalf and in representation of the legal conjugal partnership constituted by them and as *parens patria potestas* over their minor children Alexander S. Fairest Brooke and Michael A. Fairest Broke filed a civil complaint in the case at bar against defendant Marine World Distributors, Inc. (hereafter "Marine World") a corporation organized and existing under the laws of Puerto Rico, dedicated to the sale and servicing of water vessels, primarily pleasure boats, in Puerto Rico. The complaint seeks redress for damages inflicted upon plaintiffs by defendant's failure to sell to plaintiffs a boat fit for its intended use; failure to make repairs to the vessel with the workmanship standards and competence that defendant represented to plaintiff that it had; and for negligent infliction of mental anguish and emotional distress upon plaintiffs, pursuant to the applicable case law of the United States and the applicable provisions of the Puerto Rico Civil Code.  (Docket No. 1).

<u>Richard S. Fairest-Knight v. Marine World Distributors, Inc.</u>
Civil No. 07-1708 (CVR)
Opinion and Order
Page 2

Defendant answered the complaint denying any liability, claiming that plaintiffs purchased a used vessel without any express warranty in "as is" condition and also claiming that defendant properly addressed and repaired the different problems the vessel had subsequent to its purchase. (Docket No. 6).

Upon conclusion of the discovery proceedings, the parties consented to proceed before the undersigned Magistrate Judge for all further proceedings including the non-jury trial and the entry of judgment. (Docket Nos. 63 and 64).

On June 8 to 12, 2009, the non-jury trial was held before this Magistrate Judge. (Docket Nos. 80-84). Plaintiffs presented the testimonies of Carlos Suárez-Armstrong, Benigno Nieves, Philippo Tavormina, María Teresa Arzola de Rubio, Counsel John Nevárez, in addition to the their own testimonies (Mr. Fairest, Mrs. Fairest and their two adolescent sons Alexander and Michael).[1] Defendant presented the testimonies of Sebastián Gandía-Sandoval, Angel Meléndez and Mr. Philippo Tavormina. The following exhibits were admitted into evidence: Joint Exhibits I-XIII (Docket No. 85), plaintiffs' Exhibits 1-11, 13-17, and 19-24 (Docket No. 86) and defendant's Exhibit B (Docket No. 87).

The Court ordered the transcripts of the non-jury trial and the parties were granted thirty (30) days thereafter to file simultaneous post trial briefs. (Docket No. 84).

---

[1] After plaintiffs rested their case, counsel for defendant presented an oral motion under Rule 52(c). Counsel for plaintiffs responded in opposition. After hearing the arguments, the Court declined to render any judgment until the end of the evidence. (Docket No. 83).

On July 14, 2009, the transcripts of the trial were filed. (Docket Nos. 88-92). After several extensions of time were requested by the parties and granted by the Court, both parties filed their post trial briefs on December 4, 2009. (Docket No. 101 and 102).

## FINDINGS OF FACT

1. Since July 1995, plaintiff Mr. Fairest has been an executive for Sony Latin America.

2. Mr. Fairest lived in Guaynabo, Puerto Rico for proximately five (5) years between 2003 and 2008, with his wife Valerie and their two (2) sons, Alexander and Michael.

3. On August 13, 2004, Mr. Fairest purchased from defendant Marine World a used 2001 Bayliner Sierra boat, model 2655, equipped with a 5.7 L merc cruiser, inboard engine for $39,075.00. The boat hull serial number is BLGB74SDA101.

4. At the time of purchase, Mr. Fairest signed a sales order in a printed format produced by Marine World (JE-II), which states on its second page, paragraph 13, "Brokered boats. I understand that all brokered boats, all brokered and used boats or rigs are sold 'as is', and that you may make no warranty whatsoever unless in writing on the other side." No express warranty is contained in the document.

5. Prior to selling the boat to Mr. Fairest, defendant hired the services of Mr. Carlos Suárez-Armstrong, a mechanical engineer and marine surveyor, to perform a condition evaluation report, which Mr. Suárez-Armstrong conducted on March 29, 2004. Its findings are contained in a report entitled "Condition and Valuation Survey conducted on 'M/B Sandra' a Bayliner Sierra 2655, while hauled out on a trailer, at

   Marine World center lot, Caguas, PR on March 29, 2004. (JE-I)". At page 5 of this report, under the title *REMARKS*, item 3 states: "engine could not be tested; no cooling water available."

6.  At the time of purchase, Mr. Fairest conducted a sea trial with Mr. Joey Salas, who has boating experience. At trial, Mr. Fairest admitted the boat performed appropriately.

7.  Upon purchasing the boat, Mr. Fairest purchased insurance coverage for the boat (PE 2, 3, 4, 5, 6, 7 and 8), rented a dry dock space at Marina Puerto del Rey in Fajardo, where the boat was placed. (PE 11).

8.  Mr. Fairest purchased an emergency assistant service paid yearly, by Sea Tow (Puerto Rico Sea Tow), which covers towing services within Puerto Rico's coastal waters, including Culebra, Vieques, the US and British Virgin Islands. (PE 13).

9.  Subsequent to purchasing the boat, the Fairest Family enrolled in a ten (10) week course offered by the US Power Squadron, which covers basic operation and safety measures for pleasure boating (PE 9), and obtained licenses to operate a pleasure boat from the government of Puerto Rico. (PE 10).

10.  During June and July 2005, plaintiffs were able to travel in the boat to Palomino, Palominito, Icacos, Culebra, Tortola and St. Thomas without any incident.

11. Less than three (3) months after purchasing the boat, the transmission broke down and Marine World made repairs which deprived plaintiffs from the use of the vessel not less than twenty four (24) days. Marine World did not charge plaintiffs for these repairs.[2]

12. On January 22, 2005, plaintiffs were leaving Marina Puerto del Rey in Fajardo and about five hundred (500) meters outside of the marina, the alarm went off and there were two (2) to three (3) inches of oil in the bottom of the engine compartment and the engine itself was doused with oil, but the motor itself, inside, did not have any oil. The boat had to be towed back to the marina.

13. Upon plaintiff's request, on January 27, 2005, Marine World inspected the engine, diagnosed a leak in the oil pan, stated that to repair the engine it was necessary to remove the engine to turn it over and replace the oil pan and any other piece which was defective. (JE-III).

14. Plaintiff authorized the work recommended by Marine World, which was performed on February 8, 2005. (JE-IV). However, Mr. Sebastián Gandía, the marine technician working for defendant who performed the repair, admitted that defendant's initial diagnosis of the problem was incorrect, since the oil leak was not in the oil pan but in a part called the "sender". Between the malfunction caused by the oil leak and the resolution of the problem by defendant, plaintiffs were deprived of the use of the boat for thirty six (36) days.

---

[2] Plaintiffs' counsel clarified at trial that plaintiffs are not claiming any amount for the boat's transmission.

15. On May 2005, a complete tune up and replacement of the impeller was performed on the boat which included replacement of spark plugs, filter and oil filter, gas filter, transmission lubricant, engine lubrication and change of impeller, plus several other repairs including sanding and painting of pulleys and replacement of serpentine or belt ("polea serpentina"). (JE-V). On June 6, 2005, the invoice was issued for $1,333.99 which was paid by plaintiffs.

16. On August 23, 2005, the seawater pump was not working and it was necessary to replace both the pump and the serpentine at a cost of $632.90 to plaintiffs. The repair was made on September 2, 2005 and Marine World stated in the invoice that the engine was "Ok" ("el motor ok"). (PE 20).

17. On September 27, 2005, the engine was removed from the boat, manifolds and elbows were disassembled along with all other parts which were found to be corroded, which were cleaned and painted. The oil pan was replaced and the engine was installed in the boat and a sea trial was carried out on October 26, 2005. Marine World certified that "everything is in order" and plaintiffs were charged $2,636.48 which they paid. (JE-VI).

18. In early November, 2005, plaintiffs complained that the alternator belt was slipping and making a loud noise. On November 7, 2005, a technician from Marine World verified that a bracket of the power steering pump was missing. On November 19, 2005, Marine World installed the bracket and tightened the belt, certifying once

more that everything was in order ("todo quedó en orden"). (PE 21). Plaintiffs were charged $67.23 and they paid said amount for the installation of the bracket that defendant admitted to have mistakenly left uninstalled during the prior work.

19. During the following four (4) months, the boat's malfunctioning remained the same.

20. On April 25, 2006, plaintiff Mr. Fairest complained in writing to Marine World that the boat "has left us stranded on various occasions at sea - the motor runs at its normal 3,000 RPM and it begins to fail and loose RPM even though it is still running - a week ago in Culebra the gasoline filter was cleaned... and it did not fail in returning to Puerto del Rey. Nevertheless, the doubt of the failure is still there...". (PE 15).

21. On May 3, 2006, plaintiff requested that the pump and the temperature sensors be checked.

22. On May 17, 2006, Marine World checked the GPS and found the terminals disconnected which were connected correctly. (JE VII, page 2). Marine World further indicated: "sea trial carried out to check failure engine ran well at 4,500 RPM and no failure was observed." The document does not indicate when was the sea trial done.

23. On May 19, 2006, plaintiff took the boat to Culebra and after forty five (45) minutes, the engine began to fail and to lose RPM. (PE 15).

24. The following day, going to Culebrita, the engine failed completely after thirty (30) minutes and it took more than four (4) hours to tow it back to Marina Puerto del Rey. (PE 15).

Richard S. Fairest-Knight v. Marine World Distributors, Inc.
Civil No. 07-1708 (CVR)
Opinion and Order
Page 8

25. JE-VII is a repair order invoice dated May 26, 2006 which charged $186.92 to plaintiffs for a tune up and impeller change. Mr. Angel Meléndez testified that both the tune up and the sea trial were conducted. Mr. Meléndez testified that a sea trial of the vessel was done at that time "...because the customer complained in some kind of engine, he find some kind of engine failure at 3,000 RPM, ...and I didn't find anything wrong at that moment."

26. The problem persisted and the boat was not in use as shown in JE-VIII, which at page 3 describes the incidents which occurred.

27. JE-VIII states that on May 27, 2006: "[i]nspection carried out on engine. Engine starts, but does not hold in low gear for more than 30 seconds. Carburetor is not leaking gasoline. Electric fuel pump was removed for inspection, the pump got hot as soon as it began pumping gasoline. Electric fuel pump replaced and carburetor cleaned."

28. JE-VIII states that on June 5, 2006: "sea trial carried out. Initially engine had trouble starting, but when boat was taken to Vieques, no other failures were observed."

29. JE-VIII states that on August 10, 2006: "batteries were removed and charged at the shop...engine was started. The trial was carried out for one hour but back at the marina, the engine started backfiring and stalled several times. Fuel filter was checked and found to be clean... Several tests carried out and everything was ok. Fuel tank vent was checked and found to be clogged with salt deposits obstructing air flow."

30. JE-VIII states that on August 12, 2006: "[f]uel tank vent replaced."

31. JE-VIII states that on Aug 15, 2006: "sea trial carried out and engine did not fail."

32. JE-VIII states that on August 23, 2006: "customer called to report the same problem engine failure continues."

33. JE-VIII, page 4, indicates that on August 30, 2006: "fuel tank vent checked and everything was ok. Entire fuel pick-up assembly was removed and replaced with a new one, without a check valve. Customer should carry out a sea trial."

34. On August 30, 2006, repair order invoice (JE-VIII) was issued and plaintiffs were charged $2,889.89 which they paid.

35. The boat was serviced for not less than 130 days between the end of May, 2006 through the entire month of August 2006.

36. On September 23, 2006, three (3) weeks after the closing of repair order invoice number 2735 (JE-VIII), plaintiffs attempted to take the boat to Icacos and after forty (40) minutes the boat failed again, losing power and eventually shutting down. Mr. Fairest complained to defendant via fax dated September 25, 2006 (PE 17) suggesting a fuel problem. In this particular incident, plaintiff Mr. Fairest testified he was accompanied by friends, Mr. and Mrs. Javier Rubio and their daughter, which made the situation more stressful. This was corroborated by the testimony of Mrs. María Teresa Arzola de Rubio, who indicated that the two (2) families had originally intended to take the boat to Culebra, but because of the malfunction of the engine, decided to stay at Icacos which is closer to Fajardo.

37. During the month of October 2006, the situation persisted. Mr. Angel Meléndez, Marine World technician, went for a sea trial with Mr. Fairest according to his testimony, the week before the work described in repair order invoice 500399 began, which was the 3rd of November. According to Mr. Meléndez' testimony, they traveled in the boat to Culebra and when they were very close to their destination "...that's when the engine started misfiring. It was starting to - when I say misfiring, its you know, started, like, how you call that?, hesitating, or losing RPM, you know its started backfiring and stuff." Then, they decided to return to Fajardo, and prior to arriving at Marina Puerto del Rey, the engine stop working and locked-up "...the engine just died." Thus, they had to call Sea Tow, which provided the towing services back to the marina.

38. Mr. Meléndez continued testifying that the next Monday he found that there was a lot of water inside of the engine, inside of the cylinders. Therefore, they took the engine out and sent it to the Marine World facilities at Kennedy Avenue in San Juan. The work performed is the one included in JE-X, and is described as an "engine overhaul", which according to the repair order invoice, was started on November 3, 2006 and completed on December 20,2006, for a total of forty seven (47) days. For this job, plaintiffs were charged and paid $3,970.69.

39. On December 20, 2006, Mr. Fairest attempted to travel to Culebra in the boat with his family to spend Christmas and experienced the same problem. The engine stalled and then died, and the boat had to be towed back to Fajardo. Mr. Fairest sent his family by ferry to Culebra and joined then later by the same means. With respect to

this incident, Mr. Meléndez testified that by December 22 he was checking the boat for an internal noise, so serious that the boat was taken out of the water and sent back to the Kennedy Avenue shop in San Juan.

40. Pursuant to repair order invoice number 500648, work on the vessel began on December 22, 2006 and was concluded on February 15, 2007 (JE-XI) for a total of fifty three (53) days.

41. With respect to the repairs between November 2006 and February 2007, Mr. Phillipo Tavormina, Marine World witness and representative at trial, testified that Mr. Fairest was presented by Marine World with two (2) options, either to repair the engine or to replace the engine's "long block." Mr. Fairest chose the option generally chosen by most clients, to repair the engine. Mr. Tavormina admitted this solution did not work and the engine was taken out of the vessel again and the long block replaced. However, Marine World also admitted that when the engine was disassembled to replace the long block and reinstalled in the boat, Marine World put the same salt water pump which had been placed eighteen (18) months before, which contained the same defective impeller that Marine World had been requested to change and did not change. For the repairs described in JE-XI, which included the replacement of the engine long block, plaintiffs were charged and paid $2,950.89 (JE-XI).

42. During the end of February 2007 and the month of March of 2007, the boat made two (2) short trips, each one less than forty five (45) minutes from Marina Puerto del Rey, one to Palomino Island and one to Palominito. (PE 23).

Richard S. Fairest-Knight v. Marine World Distributors, Inc.
Civil No. 07-1708 (CVR)
Opinion and Order
Page 12

43. On April 14, 2007, plaintiffs embarked on a trip to Culebra and after forty five (45) minutes the engine died, presenting similar symptoms of many times before. After the engine rested for five (5) to ten (10) minutes, it was restarted and plaintiffs continued toward Culebra at a very slow pace. Upon arrival at the pier in Dewey, Culebra, the engine was turned off for thirty (30) minutes, before plaintiff attempted to continue on to Costa Bonita. When the engine was restarted and the boat started moving again, slowly under the bridge and through the channel toward Costa Bonita, after approximately ten (10) minutes, large amounts of smoke started to come out from the engine compartment. The engine was immediately shut off and Mr. Fairest instructed his family to put on their life vests on and prepare to abandon the vessel.

44. The Fairest family members testified that they thought the boat could either burn and sink or explode at any moment.  All four (4) members of the Fairest family felt great fear for their respective lives and those of the other members of the family.

## LEGAL DISCUSSION

**I.   DEFICIENT REPAIRS**.

The Court of Appeals for the First Circuit in La Esperanza de P.R., Inc. v. Pérez y Cía. de P.R., Inc., 124 F.3d 10, 16 (1st Cir. 1997) established that claims of plaintiffs in this kind of case are under federal maritime law.  This is so because "[a]dmiralty jurisdiction brings with it a body of federal jurisprudence, largely uncodified, known as maritime law." In re Ballard Shipping Co. v. Beach Shellfish, 32 F.3d 623, 625 (1st Cir. 1994) (citing East River S.S. Corp. v. Transamerica Delaval, 476 U.S. 858, 864, 106 S.Ct. 2295, 2298 (1986). While a contract to construct a ship falls outside federal admiralty jurisdiction because it is "a

contract made on land, to be performed on land," People's Ferry Co. v. Beers, 61 U.S. (20 How.) 393, 402, 15 L.Ed. 961 (1857), contracts for repairs to a vessel or for its substantial reconstruction come under the scope of admiralty jurisdiction. Id; *see also* Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961); New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922); *see also* 28 U.S.C. § 1333 (granting exclusive federal jurisdiction in "[a]ny civil case of admiralty"); *cf.* Thomas J. Schoenbaum, 1 *Admiralty and Maritime Law* at 111-12 (2d ed. 1994). In the absence of a relevant statute, the judicially-developed norms of the general maritime law, "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," govern actions in admiralty. East River S.S. Corp. v. Transamerica Delaval, 476 U.S. at 865, 106 S.Ct. at 2299; La Esperanza, 124 F.3d at 16.

Under the body of law of the sea, a shipowner may sue in either tort or contract for negligent repairs to his vessel. La Esperanza, 124 F.3d at 16, *see also* Todd Shipyards Corp. v. Turbine Serv., Inc., 674 F.2d 401, 412 (5th Cir. 1982); Alcoa S.S. Co. v. Charles Ferran & Co., 383 F.2d 46, 50 (5th Cir. 1967). A ship repairer potentially faces three (3) sources of liability for repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). *See* Alcoa S.S. Co., 383 F.2d at 50; *see also* Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc., 866 F.2d 752, 763 n. 17 (5th Cir. 1989). A ship repairer may also be liable for the maritime tort of negligence. *See* Alcoa S.S. Co, 383 F.2d at 50. Importantly, negligence

causes of action in admiralty invoke the principles of maritime negligence, not those of the common law. *See* Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 408-09, 74 S.Ct. 202, 204-04, 98 L.Ed. 143 (1953).

Moreover, while the implied warranty of workmanlike performance "parallel[s] a negligence standard rather than imposing [the] strict liability" that attaches to implied warranties in land-based contracts under the Uniform Commercial Code, *see* Employers Ins., 866 F.2d at 763 n. 17, "a shipowner may receive indemnity from a marine contractor for breach of implied warranty of workmanlike service, albeit that such performance was done without negligence."; La Esperanza, 124 F. 3d at 16; SS Amazonia v. New Jersey Export Marine Carpenters, Inc., 564 F.2d 5, 8 (2d Cir. 1977) (citing Italia Societa v. Oregon Stevedoring Co., 376 U.S. 315, 324, 84 S.Ct. 748, 754, 11 L.Ed.2d 732 (1964)) and Ryan Stevedor Co. v. Pan-Atlantic Steam Corp., 350 U.S. 124, 133, 76 S.Ct. 232, 237(1956)). This doctrine provides that a maritime contractor "who contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner." Northern Insurance Co. of New York v. Point Judith Marina, LLC., 579 F. 3d 61 (1st Cir. 2009); Parks v. United States, 784 F.2d 20, 26 (1st Cir. 1986). Finally, federally developed maritime law applies both when a court construes the terms of a repair contract and when it construes the standard of performance due thereunder. *See* Alcoa S.S., 383 F.2d at 50.

Based on the documentary evidence presented at the trial, and after assessing the testimony of the witness and their credibility, we find defendant Marine World breached its duty to a workmanlike performance upon which plaintiffs had a right to rely. Evidence of the breach of Marine World are the repeated repairs which had to be done to the boat

over an extended period of time which prevented plaintiffs from enjoying their boat. Moreover, there was a repeated failure to identify the source of the engine's failure despite representations to plaintiffs that the boat was in a seaworthy condition. Evidence was presented that Marine World was the only entity which serviced the boat during the period of time at issue. It is uncontested that no one else did repairs to the boat. Sea trials were conducted in which the boat's engine failed after cruising for forty five (45) minutes at 3,000 RPM's, as admitted by Marine World, even though the boat was supposed to be in a good condition. Several attempts to repair the boat were made to no avail. The best evidence that the repairs to the boat by Marine World were faulty are the invoices which show the boat could not be used for its intended use over extended periods of time because the boat was being repaired for multiple malfunctions.

We do not credit defendant's assertions that plaintiffs failed to provide proper maintenance to the boat. Credible evidence was presented on how Mr. Fairest cleaned the boat and flushed the engine after each use. Moreover, the boat spent so much time under repairs that any need for maintenance should have been noticed by Marine World and notified to plaintiffs. No credible evidence was presented that the corrosion found in the boat was caused by plaintiffs' failure to give proper maintenance to the boat. The evidence presented at trial shows that Mr. Fairest followed the recommendations made by Marine World as to replacement of parts and the boat's maintenance.

We do not credit either defendant's contention the repairs at issue were in relation to regular maintenance work and normal wear and tear of parts and accessories. Even though all jobs were opened and closed and repairs were done, the kind of repairs which

were done (such as replacement of the engine's long block, change of sea water pump, engine pulleys, manifolds, among others) amounting to over $15,000.00 and the towage of the vessel on at least five (5) occasions over a period of thirty one (31) months certainly do not entail regular maintenance.

Accordingly, plaintiffs are entitled to recover the cost of the unsuccessful repairs which were paid by them to Marine World in the amount of $15,739.96; towage to mooring from open sea in the amount of $3,195.20; storage at Marina Puerto del Rey's dry stack and insurance up to June 30, 2007 in the amount of $2,990.00 and $13.00 per day thereafter.

## II.   BOAT'S PURCHASE PRICE.

Plaintiffs claim they are entitled to recover the amount they paid when they purchased the boat, namely, $39,075.00, because it was not fit for its intended use and it was Marine World's duty to ascertain that the boat was not defective when it sold it to plaintiffs. We believe Marine World complied with its duty to ascertain the boat was not defective at the moment it sold the boat to plaintiffs.

The evidence shows the boat was in good condition at the time of purchase. Mr. Fairest acknowledged that he purchased the boat "as is" and that he knew what that meant. Prior to selling the boat to Mr. Fairest, defendant hired the services of Mr. Carlos Suárez-Armstrong, a mechanical engineer and marine surveyor, to perform a condition evaluation report, which Mr. Suárez-Armstrong conducted on March 29, 2004. Even though the engine could not be tested by Mr. Suárez-Armstrong at that time, the boat was certified as "good for intended cruising around Puerto Rico and Coastal waters, after recommendations are accomplished." (JE-I, p. 7). Mr. Fairest was aware of this certification at the time of

purchase. Moreover, at the time of purchase, Mr. Fairest conducted a sea trial with Mr. Joey Salas (who has boating experience) and the boat performed appropriately. During June and July 2005, plaintiffs were able to travel in the boat to Palomino, Palominito, Icacos, Culebra, Tortola and St. Thomas without any incident. Thus, plaintiffs were able to use the boat once or twice a month for three (3) months prior to the transmission breaking down which was repaired by Marine World at no cost.

In view of the foregoing, we find Marine World complied with its duty to ascertain the boat was not defective at the moment it sold the boat to plaintiffs. Thus, plaintiffs are not entitled to recover the purchase price of the boat.

### III. Emotional Distress and Damages.

Plaintiffs claim they are entitled to recover emotional damages under negligent infliction of emotional distress and for pain and suffering under the Commonwealth's tort statute, Article 1802 of the Puerto Rico Civil Code.[3] We agree.

In Peemoller Sultan, v. Pleasure Craft Contender 25, 139 F Supp. 2nd 230, 235 (District Puerto Rico 2001), citing with approval the case of Chan v. Society Expeditions, 39 F3d. 1938 (9th Cir. 1997), this Court stated that, in maritime law, there are three main alternative standards governing liability for negligent infliction of emotional distress:

> Under the "physical injury or impact" test, the plaintiff may recover damages only if he or she experiences physical contact or injury in addition to emotional distress, *Id*. Under the "zone of danger" standard, a plaintiff need

---

[3] The Puerto Rico Civil Code Article 1802 provides that a person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity. Civil Code Sec. 1802 (31 L.P.R.A. § 5141).

not experience physical injury or impact to recover damages so long as the plaintiff witnesses the endangerment of another and is also placed at risk of physical injury due to the defendant's negligence. *Id.* Under the "bystander proximity" theory, a plaintiff may recover for emotional damages if he or she: (1) is physically close to the scene of the accident; (2) directly witnesses the incident and (3) is a close relation to the victim.

In this case, the "physical injury or impact" test is nor applicable. But, either under the "zone of danger" or the "bystander proximity" theory, we find that plaintiffs met the criteria. Taking into account the evidence presented at the trial, we find the emotional distress suffered by plaintiffs was directly caused by the negligent faulty repairs by Marine World and its failure to identify the cause of the engine's problem even though plaintiffs were told the boat was fit for use. We agree with plaintiffs that, although its Work Order/Invoices represented that Mr. Fairest's complaint had been resolved (JE-IV, V, VI, VII, IX), the fact is that no such resolution was ever attained and the problems persisted. Plaintiffs testified as to how they felt including feelings of frustration in not being able to use the boat as intended and about their dissatisfaction when the engine failed while cruising. Also, plaintiffs lost confidence in the boat and felt great fear and stress particularly when they believed their lives were at risk during the incident on April 14, 2007 on their way to Costa Bonita. Furthermore, the boat's problems caused many inconveniences to the Fairest family and their friends as testified at trial. Moreover, this situation required Mr. Fairest to invest a great amount of time trying to solve the situation. Finally, plaintiffs were deprived of using and enjoying the boat for extended periods of time.

Thus, for the negligent infliction of emotional distress and for pain and suffering under Article 1802 of the Puerto Rico Civil Code, we award to plaintiffs the following

amounts in damages: Mr. Fairest $30,000.00; Mrs. Fairest $15,000.00: Alexander Fairest $5,000.00; and Michael Fairest $5,000.00.

## CONCLUSION

For the above reasons, the Court finds defendant Marine World is liable to plaintiffs and the Court AWARDS:

1) Plaintiffs the amount of $15,739.96 for the faulty repairs of the boat.

2) Plaintiffs the amount of $3,195.20 for towage to mooring from open sea.

3) Plaintiffs the amount of $2,990.00 for storage at Marina Puerto del Rey's dry stack and insurance up to June 30, 2007 and $13.00 per day thereafter until the entry of judgment.

4) Mr. Richard Fairest the amount of $30,000.00 in damages.

5) Mrs. Valerie Fairest the amount of $15,000.00 in damages.

6) Alexander Fairest the amount of $5,000.00 in damages.

7) Michael Fairest the amount of $5,000.00 in damages.

8) Plaintiffs are further entitled to costs and attorneys' fees, and interests after judgment. Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 11th day of December of 2009.

s/**CAMILLE L. VELEZ-RIVE**
**CAMILLE L. VELEZ-RIVE**
**UNITED STATES MAGISTRATE JUDGE**